# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DELANA D. DITTERLINE, TERRY L. DITTERLINE, BRYAN A. DITTERLINE, and BRANDON A. DITTERLINE, | |
| Plaintiffs, | Case No. 3:15-cv-01287-JPG-SCW |
| v. | |
| KITISHA N. RAY, DUSTIN TURSKA, LYLE WOMACK, and LLOYD BOSECKER, | |
| Defendants. | |

## MEMORANDUM & ORDER

**J. PHIL GILBERT, DISTRICT JUDGE**

This matter comes before the Court on the defendants' motion for summary judgment. (Doc. 51.) The plaintiffs have filed a timely response in opposition. (Doc. 52.)

## I. BACKGROUND

The material facts of this case are hotly contested, but here is a summary of the evidence in the light most favorable to the non-moving party: the Ditterlines. The Ditterlines live in Mounds, Illinois. One day, Officer Dustin Turska of the Mounds Police Department pulled over one of the two sons in the family—Brandon Ditterline—for an alleged seat-belt violation. Brandon provided Officer Turska with his registration and driver's license. Officer Turska then gave Brandon a verbal warning and told Brandon that he was free to go. (Doc. 51–3, Terry Ditterline Dep. 12.)

Unfortunately, what appears at first-glance to have been a routine traffic stop is not so simple. Brandon had recently confessed to members of his family that the police kept pulling him over. His brother—Bryan Ditterline—was particularly upset by this revelation because he

1

believed the repeated traffic stops to be baseless. So when Bryan received a call from his mother—Delana Ditterline—that the police had pulled Brandon over once again, Bryan got in a truck with his father—Terry Ditterline—and went to do something about the situation. They found Delana and Officer Turska in a Veterans of Foreign Wars (VFW) parking lot and parked next to Delana's vehicle. (Doc. 52-1, Bryan Ditterline Dep. at 23–27.)

Once Bryan and Terry parked, Bryan exited the truck shirtless and confronted Officer Turska. Officer Turska allegedly exclaimed: "who the hell are you?" (*Id.* at 26:16.) Bryan claims that he responded: "I'm Bryan Ditterline . . . you keep messing with my brother . . . what was your probable cause?" (*Id.* at 26:16–18.) Officer Turska then asked Bryan for his identification, which Bryan did not have with him. Terry then yelled at Bryan to get back in their truck. Bryan complied. Terry then exited the truck to show Officer Turska his own identification, but Turska allegedly declined to take it. At this point, the Ditterlines claim that Officer Turska was getting "loud" and "cocky", so they decided to leave the scene and go back home—despite Officer Turska's instructions to stay. (*Id.* at 32:20–33:1.) Officer Turska followed the Ditterline's truck and turned on his emergency patrol lights after approximately three blocks. The Ditterlines refused to stop, so Officer Turska signaled for back-up and followed the Ditterlines all the way back to their home.

Once the Ditterlines arrived back home, Bryan exited his father's truck and started walking towards the house. Officer Turska jumped out of his police car, drew his gun, and allegedly pointed the laser-dot scope at Bryan's head. Another officer and defendant in this case, Kitisha Ray, drew her taser. Officer Turska screamed at Bryan to get on his knees and Bryan immediately complied. Turska then restrained Bryan on the ground and supposedly kicked him so hard that his face fell into the dirt. The force of the blow also caused Bryan's medication to fly

out of his pocket, which Turska purportedly stomped on multiple times despite Bryan's pleas to the contrary. Turska then picked Bryan up, handcuffed him, punched him in the eye, and placed him in the squad car.

Back at the truck, Terry faced problems of his own. Another law enforcement official at the scene—Deputy Kent Ray of the Pulaski County Sheriff's Department—drew his weapon and ordered Terry to show his hands. But Terry claims to suffer from Parsonage-Turner Palsy Syndrome, a disease which causes him severe pain and prevents him from raising his left hand above his waist. Terry told Deputy Ray about his disease and showed him his shoulder brace. When Deputy Ray ordered Terry to exit his truck, Terry said he was physically unable—so Deputy Ray purportedly reached in and yanked Terry out. Terry reportedly screamed in pain and told the officers again that he had a disease, which prompted Deputy Ray to say "I don't give a rat's ass about your disease. I'm going to choke you the F [sic] out." (Doc. 52-2, Terry Ditterline Dep. 72:7–9.)

Terry then stuck his finger in Deputy Ray's eye in order to stop Deputy Ray from hurting him further. This prompted Officer Lyle Womack of the Mounds Police Department—standing nearby—to threaten Terry that he would tase him, to which Terry responded it "wouldn't be very advisable because my finger is in his eye socket and it would cause the gentlemen's eye to blow up." (*Id.* at 76.) Officer Turska then rushed over to assist Ray and Womack. Terry then told the officers that he would let Deputy Ray go if Ray did the same for him, and then Terry would walk to the back of his truck and let the officers arrest him. The officers agreed to the deal, so Terry and Deputy Ray released each other and Terry walked to the back of the truck. But when the officers went to cuff him, Terry alleges that they violently forced his arms behind his back in defiance of his cautions about his disease.

When Delana saw that Deputy Kent Ray had drawn his weapon at her husband, she attempted to intervene and tell them about Terry's disease. But another officer at the scene—Kitisha Ray of the Mounds Police Department—grabbed Delana and pushed her into the side of a truck. Delana said that she recently had back surgery and told Officer Kitisha Ray that she was hurting her, but Officer Ray allegedly replied "back surgery my ass" and handcuffed Delana. (Doc. 51-2, Delana Ditterline Dep. 40:18–20.) Delana then claims that Officer Kitisha Ray dragged her to a nearby police SUV and attempted to shove her into the vehicle, but Delana told Officer Ray again that she was hurting her and that she could not get into the SUV easily because of her physical impairments. Officer Kitisha Ray apparently let Delana go at this point, but Ray also warned her that she could go "ghetto" on Delana: Officer Kitisha Ray admits to this allegation and describes "ghetto" as meaning "[a]ll rambunctious and out of control and just -- I mean, whatever was whatever." (Doc. 51-5, Kitisha Ray Dep. 75:16–19.)

The last plaintiff is Brandon Ditterline: the brother who Officer Turska pulled over to set off this series of events. Brandon was at the house during the conflict and witnessed the officers dragging his father out of his truck, watching from afar. Apparently one of the officers—Lyle Womack—put his hands on his weapons, ran towards Brandon, and ordered Brandon to freeze. When Brandon asked why he needed to freeze, Officer Womack allegedly shoved Brandon in his chest—hurting Brandon because of his past open-heart surgery—and punched Brandon in the side of the head. Brandon then claims that he stuck his arm out to prevent Officer Womack from drawing his taser because he was scared that the electric shock could have killed him considering his heart defect. (Doc. 51-4, Brandon Ditterline Dep. 25 77–79.)

Following this brawl, the Ditterlines filed a *pro se* complaint against the defendants in this Court pursuant to 42 U.S.C. § 1983. (Doc. 6.) The complaint is centered on one theory: the

defendants used excessive force against the defendants in violation of their Fourth Amendment rights. The only remaining defendants in the case are Officer Turska, Officer Kitisha Ray, Officer Womack, and Officer Bosecker—an officer who was not present for any of the events mentioned in this summary, but was allegedly responsible for pulling Brandon Ditterline over repeatedly without cause, causing the family's anger that led to this entire situation. This matter is now before the Court on the defendants' motion for summary judgment.

## II. LEGAL STANDARDS

### i. *Summary Judgment*

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). If the moving party bears the burden of persuasion on an issue at trial, it must "lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. National Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015); *accord Felix v. Wisconsin Dep't of Transp.*, 828 F.3d 560, 570 (7th Cir. 2016). Where the moving party fails to meet that strict burden, the Court cannot enter

summary judgment for that party even if the opposing party fails to present relevant evidence in response. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a motion for summary judgment, the nonmoving party may not simply rest upon the allegations contained in the pleadings, but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322–26; *Anderson*, 477 U.S. at 256–57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts". *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact only exists if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

  ii. *Section 1983 and the Fourth Amendment*

The standards for a successful Section 1983 action against local police officers are well known. In order to state a Section 1983 claim under these circumstances, a plaintiff must allege that the defendant (1) deprived the plaintiff of rights secured by the Constitution or laws of the United States, and (2) that the defendant was acting under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *McKinney v. Duplain*, 463 F.3d 679, 683 (7th Cir. 2006); *Brokaw v. Mercer Co.*, 235 F.3d 1000, 1009 (7th Cir. 2000).

Here, the Ditterlines allege that the defendants violated their Fourth Amendment rights. The Fourth Amendment to the Constitution provides that the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation,

and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. amend. IV.

Accordingly, the Fourth Amendment forbids unreasonable seizures, including seizures of individuals that are unreasonable because they involve the use of excessive force. *See Graham v. Connor*, 490 U.S. 386, 394–95 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985). To determine whether an officer used excessive force, the Court balances the nature and quality of the Fourth Amendment intrusion on the plaintiff with the governmental interest at stake. *Garner*, 471 U.S. at 8. The Court must give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The test is an objective reasonableness test: the situation should be evaluated from the point of view of a reasonable officer on the scene rather than in 20/20 hindsight. *Id.* The officer's "use of force is unconstitutional if, judging from the totality of the circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Chelios v. Heavener*, 520 F.3d 678, 689 (7th Cir. 2008) (internal quotations omitted).

## III. ANALYSIS

### i. *Genuine Disputes over the Material Facts*

As an initial matter, both parties agree that there are not sufficient disputed facts against defendant Lloyd Bosecker, so summary judgment as to that defendant is warranted. The defendants have not shown however, that any other defendant is entitled to summary judgment considering the breadth of disputed facts in this case.

While the Court presented the summary of the facts above in the light most favorable to the non-moving party—the Ditterlines—the defendants have painted a different picture. For example, Officer Turska testified to a much more menacing encounter at the VFW parking lot: this scene included (1) Bryan Ditterline aggressively screaming profanities at Officer Turska, and (2) Terry Ditterline acting very hostile rather than being a righteous parent trying to calm the situation. (Doc. 51-1, Dustin Turska Dep. 16–20.) Officer Turska claimed that the encounter at the VFW culminated in Terry nearly running Officer Turska over with his truck as he fled the scene. (*Id.* at 20.) Officer Turska also testified that Bryan was much more aggressive at the showdown at the house, and that he refused Officer Turska's orders to lay on the ground and put his hands behind his back. (*Id.* at 27, 46.) To provide another example: at Kitisha Ray's deposition, she testified that she was concerned that Delana Ditterline would harm her because she appeared angry and because Ray was unsure whether Delana was carrying any weapons. (Doc. 51–5, Kitisha Ray Dep. 83–84.)

When comparing the depositions of the plaintiffs to the defendants, more disputed facts emerge. For example, Officer Turska did not deny that Terry instructed the officers about his Parsonage-Turner Palsy Syndrome and, accordingly, the severe pain he suffered by having his arms forced behind his back. (*See* Doc. 51-1, Dustin Turska Dep. at 40.) And even though Officer Kitisha Ray admitted that she said she would go "ghetto" on Delana Ditterline, she also testified that she questioned whether Delana Ditterline was telling the truth when she stated that she could not get into Officer Womack's SUV because of her physical impairments, considering Officer Ray said she saw Delana get out of a truck just before the encounter. (Doc. 51-5, Kitisha Ray Dep. 50.) In sum, there are just too many caustically disputed facts and issues of credibility

for summary judgment to be appropriate here, especially considering the Court must construe the evidence in the light most favorable to the Ditterlines.

Moreover, a reasonable jury could find that the defendants engaged in excessive force against the Ditterlines in violation of the Fourth Amendment—depending on which version of the facts that they believe. A jury could find that the Ditterlines—or any combination of the family members—truly did not pose an immediate threat to the officers, that they did not commit any serious crimes, and that they were not resisting arrest: all factors that indicate the use of force was unreasonably excessive. *See Graham*, 490 U.S. at 396. But a reasonable jury could also believe the defendants' illustration of an aggressive Ditterline family posing a serious threat to the officers' safety, warranting a more severe use of force. Or, a reasonable jury could find that the story of excessive force as told by the Ditterlines did not happen at all. These matters will be an issue for the next stage in these proceedings.

    *ii.*    *Qualified Immunity*

As a final matter, the defendants also assert that they are entitled to qualified immunity on these claims. But qualified immunity does not protect a government official if their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known". *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Recent Supreme Court jurisprudence has raised the bar as to when these rights are "clearly established". *See Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011) (the Court must not define a clearly established right at a "high level of generality"); *Mullenix v. Luna*, 577 U.S., at —— – ——, 136 S.Ct. 305, 308 (2015) ("existing precedent must have placed the statutory or constitutional question beyond debate").

The right to be free from excessive force from government officials in the manner alleged by the Ditterlines is clearly established. First, the elements of this cause of action have been thoroughly explained by the Supreme Court. *See Graham, supra* at 394–95 (1989); *Garner*, *supra* at 7–8. Moreover, the Seventh Circuit Court of Appeals and the district courts in this circuit have again and again and again found that police officers violated the Fourth Amendment rights of individuals in cases similar to this one. *See Fidler v. City of Indianapolis,* 428 F. Supp. 2d 857, 863 (S.D. Ind. 2006) (excessive force present because plaintiff had already "demonstrated his submission"); *Payne v. Pauley*, 337 F.3d 767, 780 (7th Cir. 2003) ("[i]t was also well established that it was unlawful to use excessively tight handcuffs and violently yank the arms of arrestees who were not resisting arrest . . ."); *Townsel v. Jamerson*, 240 F. Supp. 3d 894, 904 (N.D. Ill. 2017) ("assaulting a restrained detainee was clearly established as a constitutional violation at the time the conduct occurred") (citing *Jacobs v. City of Chicago*, 215 F.3d 758, 774 (7th Cir. 2000)); *Hogue v. City of Fort Wayne*, 599 F. Supp. 2d 1009, 1031 (N.D. Ind. 2009) ("it was clearly established that 'police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever'") (quoting *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996)).

In this case, a reasonable officer would know that they are violating the clearly established Fourth Amendment rights of individuals when they yank the arms of Terry Ditterline—a man reportedly with Parsonage-Turner Palsy Syndrome—behind his back despite his cries of pain and pleas to the contrary; when they punch a handcuffed man—Bryan Ditterline; when they drag and try to force a woman—Delana Ditterline—into an SUV despite her warnings about her recent back-surgery (and then threatening to go "ghetto" on her); when

they charge at and punch an allegedly innocent bystander—Brandon Ditterline; and more. But whether this tale happened as alleged by the Ditterlines will be a matter for a jury to decide.

## CONCLUSION

Accordingly, the Court **GRANTS** the defendants' motion for summary judgment (Doc. 51) in relation to defendant Lloyd Bosecker ONLY and **DENIES** the defendants' motion for summary judgment in relation to the other remaining defendants. The Court **DIRECTS** the Clerk of Court to terminate defendant Lloyd Bosecker and enter judgment in favor of him at the conclusion of this case.

**IT IS SO ORDERED.**

**DATED: DECEMBER 7, 2017**

*s/ J. Phil Gilbert*
**J. PHIL GILBERT**
**DISTRICT JUDGE**